IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Cr. Nos. 19-190-9 |
| | ) | |
| JAMAL KNOX | ) | |

## Opinion on Objections

Defendant Jamal Knox proceeded to trial on a one-count indictment, charging him with conspiracy to distribute controlled substances, specifically, heroin or fentanyl, from in and around September 2017 to in and around November 2019.  The jury found Mr. Knox guilty of the charge of conspiracy to distribute controlled substances.  Verdict, ECF No. 1107.  Once the jury determined guilt, it was required to answer interrogatories to determine the type and weight of controlled substances.  *Id.*  The jury determined that Mr. Knox conspired to distribute fentanyl.  *Id.*  The jury also found that Mr. Knox did not conspire to distribute heroin.  *Id.*  The jury then found that the weight of fentanyl reasonably foreseeable to Mr. Knox was 40 grams or more.  *Id.* at 2.  The jury also specifically found that the weight of fentanyl reasonably foreseeable to Mr. Knox was not 400 grams or more of fentanyl.  *Id.*

The Probation Office has conducted a presentence investigation and submitted a presentence investigation report.  ECF No. 1192.  Both parties have been given the opportunity to file objections and position papers as required by Local Criminal Rule 32.C.4.  The Defendant, Jamal Knox, through his counsel Patrick Nightengale, has filed objections to the base offense level as well as to several adjustments that increased the base offense level.  ECF No. 1195.  The government filed a Response to the objections.  ECF No. 132.  The Probation Office submitted an addendum to the presentence report pursuant to Local Criminal Rule 32.C.6,

addressing Mr. Knox's objections.  ECF No. 1197.  The Probation Officer maintained that the offense level calculations were correct, but noted that said calculations were premised upon information received from the government.  ECF No.  1197.

Local Criminal Rule 32.10, which is modeled on U.S.S.G. § 6A1.3(a), states, "[w]hen any fact or factor material to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to introduce evidence and to present information to the Court regarding that fact or factor, in accordance with § 6A1.3(a) of the U.S.S.G."  LCrR 32.10. Section 6A1.3(a) also directs that, "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."  § 6A1.3(a).  The Sentencing Commission, as well as Courts, agree that the "use of a preponderance of the evidence standard is appropriate to meet due process requirements and policy concerns in resolving disputes regarding application of the guidelines to the facts of a case."  USSG § 6A1.3(a), comment.

An evidentiary hearing to address Mr. Knox's objections began on June 30, 2023, at which time the Court heard testimony from Anthony Gatto, a cooperating witness who had also testified at Mr. Knox's trial.  Tr., June 30, 2023, ECF No. 1210.  After taking Mr. Gatto's testimony, the hearing was continued to permit defense counsel sufficient time to review documents he had only received on the morning of June 30, 2023.  The hearing resumed on August 3, 2023, at which time the Court heard testimony from Special Agent Daniel Gramc of the Federal Bureau of Investigation.  Tr. Aug. 3, 2023, ECF No. 1211.  The parties were given sixty days to file briefs in support of their respective positions.  Said briefs have been filed (ECF

Nos. 1216 & 1217); and accordingly, pursuant to Local Criminal Rule 32.C.7, the Court hereby enters this Opinion upon defense Objections.

I.      **Objection to Base Offense Level Drug Quantity Calculation of 1.2 kilograms**

Paragraph 13 of the Presentence Investigation Report presents that the quantity of fentanyl was at least 1.2 kilograms, which equates to a base offense level of 32.  PSIR, ¶ 13.  In support of the weight of 1.2 kilograms of fentanyl, the Probation Officer explained that it was "[b]ased on the information provided by the government about witness testimony at trial, at least one witness testified that he saw the defendant in possession of multiple kilograms of fentanyl. Others testified that he fronted another member of the conspiracy between 100-400 grams of fentanyl."  PSIR, ¶ 13.  Mr. Knox objects to this drug quantity, arguing that the evidence only supports a drug quantity attributable to Mr. Knox of 40 to 160 grams of fentanyl.

At the evidentiary hearing, the government presented the testimony of cooperating witness Anthony Gatto and Agent Gramc to establish that Mr. Knox is responsible for 1.2 kilograms of fentanyl.[1]  At the hearing, the government presented testimony concerning a demonstration for weight calculation, based upon Mr. Gatto's trial testimony.  At trial, Mr. Gatto testified that he had performed construction work at Mr. Knox's residence at 280 Seneca Street. He also testified that he met Mr. Knox in November 2017 and performed work at his house "[o]ver a year period."  Trial Tr., Nov. 30, 2022, at 73, 75. 79.  At the evidentiary hearing and at trial, Mr. Gatto testified that, one time, when he arrived to do construction work at 280 Seneca Street, he saw a black garbage bag filled with rice and four to five sandwich bags full of controlled substances lying on top of the rice.  Mr. Gatto's actual trial testimony is as follows:

A.   As I start walking into the living room, I looked to my right. Sitting on the couch there's a black trash bag.  And me being curious, I walked over to the trash bag.

---

[1] In its brief, the government also cites to additional trial testimony and evidence to establish that a quantity of 1.2 kilograms attributable to Mr. Knox is justified.

> The trash bag -- I opened it up, it was filled with at least 30 pounds of rice and 4
> to 5 Ziploc baggies filled with heroin. It was definitely the most I've ever seen in
> my life.
>
> I closed it back up and I went to work. I was – I was really nervous. I
> didn't really feel comfortable being at the house with that around me.

Trial Tr., Nov. 30, 2022, at 81.  When asked whether the controlled substance was heroin or

fentanyl, Mr. Gatto stated, that the substance "would have to be tested," but he assumed "it was a

fentanyl/heroin mix from the color of it."  Trial Tr., Nov. 30, 2022, at 82.

The government did not possess the original black trash bag or its contents.  Therefore,

prior to the evidentiary hearing, Special Agent Gramc filled a trash bag with rice and, in

consultation with Mr. Gatto, filled four sandwich bags with powdered sugar and placed them on

top of the rice.  Mr. Gatto testified that the actual Ziploc bags he saw in 2018 were packed full of

a very dense substance.  Mr. Gatto testified that the filled Ziploc sandwich bags he saw inside

280 Seneca Street would likely weigh much more than the demonstration Ziploc bags filled with

the less-dense powdered sugar.  Agent Gramc weighed the powdered-sugar-filled sandwich bags

and found that they weighed 2,030.4 grams, which is more than 1.2 kilograms.  Tr. Aug. 3, 2023,

at 15; Gov. Ex. 15 (photograph of four filled Ziploc bags on a scale).  In summary, both Mr.

Gatto and Agent Gramc testified that, because the weight of the four demonstration sandwich

bags was more than 1.2 kilograms, the weight of the actual controlled substances in the bags Mr.

Gatto had viewed inside 280 Seneca contained at least 1.2 kilograms of controlled substances.

The Court is permitted to consider any relevant evidence with respect to drug quantity,

even if such evidence would lead to attributing a higher drug quantity to Mr. Knox than found by

the jury.  In considering such other evidence, the Court must be careful to not do damage to the

jury's factual findings arrived at after consideration of all the evidence.  Considering the jury's

finding, that Mr. Knox was responsible for 40 grams or more of fentanyl, but not 400 or more

grams of fentanyl, the Court observes that no weight for the controlled substances in the Ziploc bags was known, and no evidence of weight was presented to the jury.  As such, the jury did not find the weight of the fentanyl was 400 grams or more.

With respect to attributing a weight to the controlled substances observed and sampled by Mr. Gatto in the Ziploc bags at Mr. Knox's 280 Seneca Street property during 2018, the actual weight of those bags was never known or calculated.  Mr. Gatto was earnest in his testimony, and the cooperating witnesses at Mr. Knox's trial corroborated that Mr. Gatto repeatedly told them about a large black bag of drugs at that property.  However, the government's demonstration to assess weight and Special Agent Gramc's testimony about the same does not sufficiently support, by a preponderance of reliable evidence, a finding of a 1.2 kg drug weight, as argued by the government.  Although the evidence and testimony of Mr. Gatto supports a finding that fentanyl and heroin was contained within said baggies at the 280 Seneca Street property, the weight thereof will not be considered to support a finding of 1.2 kg total weight for purposes of the Sentencing Guidelines.

Considering the evidence and testimony introduced at trial and at the evidentiary hearing, this Court finds that, for purposes of the guideline calculations in this case, the drug quantity attributable to Mr. Knox is 280 to 400 grams of fentanyl.  This weight results from, at a minimum, evidence that Mr. Knox had fronted co-defendant Robert Howell, Jr. with 100 grams of fentanyl after a robbery, and that Mr. Knox had sold Mr. Howell 50 grams of fentanyl on 3 to 4 occasions.  Trial Tr., Dec. 1, 2023, at 77, 158, 170; *See also* Tr. Aug. 3, 2023, at 26.  Thus, based on the above cited evidence, the minimum amount of fentanyl attributable to Mr. Knox is 300 grams.  Mr. Knox's Objection to Paragraph 13 is therefore sustained in part and overruled in part.  It is sustained, insofar as the Court finds that amount of fentanyl attributable to Mr. Knox is

not 1.2 kilograms.  The objection is overruled insofar as Mr. Knox sought a finding that the

amount of fentanyl attributable to him is between 40 and 160 grams.  The Court finds that the

amount of fentanyl attributable to Mr. Knox is at least 280 grams but less than 400 grams.  This

equates to a base offense level of 28.

## II.        Possession of a Dangerous Weapon

Next, Mr. Knox objects to the two-level increase, imposed at paragraph 14, for

possessing a "dangerous weapon" pursuant to §2D1.1(b)(1).  Paragraph 14 states in full:

> **14.        Specific Offense Characteristics**. During a warranted search of two
> residences associated with the defendant on November 19, 2019, law enforcement
> officers found a small quantity of fentanyl, a digital scale, drug packaging
> material, $55,000 in cash, multiple boxes of ammunition and an assault rifle.
> USSG §2D1.1(b)(1).

PSIR ¶ 14.  Section 2D1.1(b)(1) states: "If a dangerous weapon (including a firearm) was

possessed, increase by 2 levels."   The Commentary to §2D1.1(b)(1) states, in relevant part,

> 11(A) <u>Application of subsection (b)(1)</u> . . . The enhancement for weapon
> possession in subsection (b)(1) reflects the increased danger of violence when
> drug traffickers possess weapons.  *The enhancement should be applied if the*
> *weapon was present, unless it is clearly improbable that the weapon was*
> *connected with the offense.*  For example, the enhancement would not be applied
> if the defendant, arrested at the defendant's residence, had an unloaded hunting
> rifle in the closet.

USSG §2D1.1(b)(1)., comment. (n. 11(A) (emphasis added).

"The government bears the burden of proof to establish [by a preponderance of the

evidence] that the enhancement set forth in U.S.S.G. §2D1.1(b)(1) applies."  *United States v.*

*Hockaday*, No. 4:CR-06-0144-02, 2009 WL 10700584, at *5 (M.D. Pa. Ar. 1, 2009) (citing

*United States v. Goggins*, 99 F.3d 116, 119 (3d Cir. 1996)).  "The weapons enhancement will

apply if the government proves that the firearm was present during the offense, and that it is not

'clearly improbable that the weapon was connected with the offense.'"  *United States v. Torres*,

529 F. App'x 303, 305–06 (3d Cir. 2013) (quoting *United States v. Thornton*, 306 F.3d 1355, 1357 (3d Cir.2002)).  "To determine whether it was not 'clearly improbable' that the firearm was connected to the offense, we consider (1) 'the type of gun involved, with clear improbability less likely with handguns than with hunting rifles'; (2) 'whether the gun was loaded'; (3) 'whether the gun was stored near the drugs or drug paraphernalia'; and (4) 'whether the gun was accessible.'"  *Torres*, 529 F. App'x at 305 (quoting *United States v. Droz*dowski, 313 F.3d 819, 822–23 (3d Cir.2002)).

In addition to the assault rifle, the government argues that the two-level enhancement is also justified based on three additional factual circumstances: (1) a handgun found in a white Infinity that Mr. Knox drove; (2) the different caliber ammunition found in Mr. Knox's bedroom; and (3) photographs of Mr. Knox holding alleged firearms.  Given the government's relatively easy burden to establish that the enhancement applies and defendant's difficult burden to show that it is "clearly improbable' that the dangerous weapon was connected with the offense, each of the government's arguments for applying the enhancement is successful.

### *Brother's Assault Rifle*

The assault rifle, as cited in paragraph 14, was found in a room in Mr. Knox's residence on the day he was arrested.  It is undisputed that the owner of the assault rifle is Mr. Knox's brother.  The rifle was not found in Mr. Knox's bedroom, although indicia of drug trafficking and numerous rounds of different caliber ammunition were found in Mr. Knox's bedroom.

Mr. Knox argues against application of the enhancement.  He points out that the assault rifle was his brother's (not his); the rifle was located in a different room from Mr. Knox's bedroom; the caliber of ammunition found in his bedroom did not fit the assault rifle; and there was no evidence demonstrating that Mr. Knox ever possessed the assault rifle.

The Court finds that the government has shown by a preponderance of the evidence that application of the enhancement for possession of the assault rifle is appropriate. It does not matter that Mr. Knox was not the lawful owner of the assault rifle or that the rifle was not in his bedroom or that he possessed ammunition that did not fit the rifle. The government has shown that the rifle was in proximity to Mr. Knox's bedroom, and it was easily accessible to Mr. Knox. The government has also shown that the rifle was located in proximity to indicia of drug trafficking. Moreover, "'the prosecution need only prove that the defendant possessed the weapon during the currency of the offense, not necessarily that he actually used it in perpetrating the crime or that he intended to do so.'" *Torres*, 529 F. App'x at 305 (quoting *United States v. McDonald*, 121 F.3d 7, 10 (1st Cir.1997)). Thus, there is no requirement that the government prove actual, as opposed to constructive, possession of the firearm. Finally, in a drug conspiracy, the two-level enhancement applies where the firearm is found in a location where acts in furtherance of the conspiracy took place. *United States v. Moses*, 289 F.3d 847, 850, (6th Cir. 2002). The evidence demonstrates that acts in furtherance of the conspiracy took place at Mr. Knox's residence. Accordingly, with respect to the assault rifle, the two-level enhancement for possession of a dangerous weapon applies.

### *Handgun found in the White Infinity*

At the evidentiary hearing, the government presented evidence in support of its argument that Mr. Knox possessed a handgun, and that such would support the two-level increase for possessing a dangerous weapon. The handgun was discovered in the glove box of a white Infinity vehicle that Knox was known to drive. It was found as a result of a traffic stop where a third-party was driving the vehicle. The traffic stop occurred in October 2019 and Mr. Knox was arrested in November 2019. It was later determined that the handgun contained Mr. Knox's

DNA.  The investigation, as well as trial testimony, shows that Mr. Knox was known to conduct drug transactions while driving the white Infinity.  Trial Tr., Dec. 1, 2022, at 66-70 (former Special Agent Goucher testified regarding two controlled buys during which Mr. Knox was driving the white Infinity, with one buy occurring inside the vehicle); Trial Tr., Dec. 1, 2022, at 26 (Wesley Ellis Barnes testifies that Mr. Knox was driving the white Infinity when he dropped off fentanyl); Trial Tr., Dec. 1, 2022, at 114 (Brandon Taylor testifies that Mr. Knox was driving the white Infinity when he dropped off fentanyl).

Mr. Knox argues against application of the enhancement as to the handgun found in the white Infinity based on the lack of evidence establishing when Mr. Knox may have touched the firearm.  He further argues that the government failed to show that Mr. Knox ever possessed the firearm, much less that he possessed it during any relevant offense conduct.  The Court finds that the enhancement properly applies as to the firearm found in the white Infinity.  Where a defendant "was not found in physical possession of a firearm and [] none was seized from his residence," the enhancement may still apply because "physical possession is not required for the enhancement to apply."  *United States v. Nixon*, No. CR 11-0045-0017, 2013 WL 12171850, at *2 (W.D. Pa. Feb. 5, 2013) (citing *United States v. Laprade*, 2013 WL 221456, * 3 (3d Cir. 2013)).  The evidence demonstrates, by a preponderance of the evidence, that Mr. Knox was known to drive the white Infinity, that he conducted drug transactions out of the white Infinity, and that his DNA was on a firearm found in the vehicle.   In light of such evidence, it is not "clearly improbable" that the firearm was connected to the offense.  Accordingly, the two-level enhancement for possession of a dangerous weapon is properly applied with respect to the firearm found in the white Infinity.

### *Rounds of Ammunition*

In the government's Proposed Findings of Fact and Conclusions of Law, it argues that the two-level enhancement also applies based on the numerous rounds of different caliber ammunition found in Mr. Knox's bedroom.  Although the ammunition discovered in Mr. Knox's bedroom was not the same caliber as that of his brother's assault rifle, the government argues that "the way one uses ammunition is by loading it into a firearm," and the presence of the ammunition suggests that Mr. Knox possessed other firearms.   Govt. Proposed Findings of Fact and Concl. of Law, at 24 (ECF No. 1217).

The Court finds that the two-level enhancement applies, based on the presence of the ammunition in Mr. Knox's bedroom, even though the ammunition did not fit any firearm found during the conspiracy.  The totality of evidence presented by the government demonstrated a long-running drug trafficking conspiracy in which firearms were present.  While the fact of unaccompanied ammunition itself does not demonstrate possession of a firearm, the totality of the evidence establishes, by a preponderance of the evidence, that this defendant, Mr. Knox, possessed the ammunition to use in firearms.  The conclusion that the ammunition found in Mr. Knox's bedroom was intended to be used by Mr. Knox in an actual firearm during the conspiracy is not "clearly improbable."

### *Photographs of Mr. Knox Holding Firearms*

The government also proffers that the enhancement for a dangerous weapon applies based on photographic evidence introduced at trial showing Mr. Knox holding firearms.

The government has shown by a preponderance of the evidence that, during the course of the conspiracy, Mr. Knox possessed firearms as evidenced by photographs introduced at trial showing Mr. Knox holding firearms.  While Mr. Knox argues that the government has failed to

establish that the firearms in the photographs were in fact real, working firearms, the totality of

the government's evidence supports this Court's conclusion, by a preponderance of the evidence,

that Mr. Knox was photographed holding actual firearms.  Further, the Court finds that it is not

"clearly improbable" that the firearms in the photographs were connected with the offense.

*Torres*, 529 F. App'x at 305 (3d Cir. 2013).

Accordingly, Mr. Knox's objection to the two-level enhancement for possessing a

dangerous weapon is overruled.  The two-level dangerous weapons enhancement applies.

### III.    Maintaining a Drug Premises

Mr. Knox next objects to the two-level increase imposed at paragraph 15 for maintaining

"a premises for the purpose of manufacturing or distributing a controlled substance."

§2D1.1(b)(12).  Paragraph 15 states that "the defendant maintained two separate residences to

store, package, or sell drugs.  Both were searched on November 19, 2019.  The defendant owned

the residence at 280 Seneca Street as of November 6, 2017.  He was not living at this address."

PSIR, ¶ 15.  The second residence referred to in this paragraph is the residence located at 7711

Tyler Road.

"Among the factors the court should consider in determining whether the defendant

'maintained' the premises are (A) whether the defendant held a possessory interest in (*e.g.*,

owned or rented) the premises and (B) the extent to which the defendant controlled access to, or

activities at, the premises."  USSG §2D1.1(b)(2), comment. (n. 17).  "The drug-premises

enhancement requires a . . . fact-intensive inquiry into the degree of control a defendant

exercised over the premises and the connection of the premises to illegal activity."  *United States*

*v. Rodriguez*, 40 F.4th 117, 120–21 (3d Cir. 2022).

To decide if the enhancement applies, [courts] examine whether the defendant exercised
control over the property "or supervised or directed others to engage in certain activities

at the premises." [*United States v.* ]*Carter*, 834 F.3d [259,] 262 [(3d Cir. 2016)](citing discussion of the meaning of "maintain" in *United States v. Morgan*, 117 F.3d 849, 857 (5th Cir. 1997)). Other considerations include "control, curation, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity." *Id.* (quoting *United States v. Jones*, 778 F.3d 375, 384 (1st Cir. 2015) (considering factors relevant to maintenance of drug-involved premises under 21 U.S.C. § 856)). Although ownership is probative, the enhancement "does not require either ownership or a leasehold." *Id.* at 263 (quoting *Jones*, 778 F.3d at 385).

*Rodriguez*, 40 F.4th at 122.

Mr. Knox maintained a bedroom at the residence at 7711 Tyler Road and would stay at this residence for long periods of time.  The investigation established a high probability that Mr. Knox was storing narcotics at 7711 Tyler Road.  The investigation and trial evidence also established that Mr. Knox stopped at 7711 Tyler Road just prior to meeting a confidential source to conduct a controlled drug buy.  When the search warrant was executed at 7711 Tyler Road, agents found, in Mr. Knox's bedroom, fentanyl, a digital scale, drug packaging material, $55,000, ammunition, and an assault rifle.  Such conduct establishes by a preponderance of the evidence that Mr. Knox maintained a controlled substance distribution operation at 7711 Tyler Road justifying application of the two-level enhancement.

Mr. Knox owned the residence at 280 Seneca Street, although he did not stay at the residence.   Trial testimony offered by one of the confidential sources indicates that Mr. Knox stored quantities of drugs at 280 Seneca Street.  Investigators also observed Mr. Knox's white Infinity at 280 Seneca Street prior to a controlled drug buy between Mr. Knox and a confidential source.  Such conduct suggests that Mr. Knox retrieved the drugs for the controlled buy from 280 Seneca Street, and it is consistent with the testimony that drugs were observed inside the residence, as testified to by Mr. Gatto.  Trial Tr., Nov. 30, 2022, at 81-82.  Accordingly, the two-level enhancement for maintaining a premises for the purpose of manufacturing or distributing a controlled substance is appropriate.

Mr. Knox's objection is overruled.  The two-level enhancement for maintaining a drug premises will be applied.

### IV.     Role in the Offense as a Leader of Criminal Activity

Mr. Knox objects to the application of a four-level enhancement for his purported role in the offense as a leader of a criminal activity that involved five or more participants.  PSIR, ¶ 18, citing §3B1.1(a).  In determining if this enhancement applies, "[f]actors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.  There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy."  USSG §3B1.1(a), comment. (n. 4).  A leader "exert[s] 'high-level directive power or influence' over the organization."  *Rodriguez*, 40 F.4th at 121 (quoting *United States v. Adair*, 38 F.4th 341, 353-55 (3d Cir. Jun. 30, 2022).  "Setting up a network to obtain and distribute drugs, deciding when and where sales would occur, coordinating drug sales with subordinates, and deciding when and whether to extend credit indicate a leadership and organizational role."  *Rodriguez*, 40 F.4th at 121 (quoting *Adair*, 38 F.4th at 354–55) (internal quotations and alterations omitted).

It is undisputed that the leaders of the subject drug organization, Hustlas Don't Sleep (HDS), were co-defendants Robert Howell Jr., and Wesley Ellis Barnes.  Indeed, the offense conduct section of the Presentence Report states that "Robert Howell Jr., and Wesley Ellis Barnes were identified as the primary leaders of the HDS organization."  PSIR, ¶ 5.  The report states that "Jamal Knox was the organization's primary fentanyl supplier, although witness

testimony at the trial showed that he was not only supplying HDS, but also others."  PSIR, ¶ 5.

Similarly, "one conspirator identified Robert Howell Jr. and Jamal Knox as the two main people

in the organization, *with Knox as the source.  Knox regularly supplied HDS with fentanyl*."

PSIR, ¶ 6 (emphasis added).

   The evidence does not establish that Mr. Knox was a leader of HDS, rather the evidence

shows that he was a primary supplier.  The evidence gathered from the investigation, the trial

testimony, and the evidence introduced at the evidentiary hearing on Objections all demonstrate

that Mr. Knox was a supplier of fentanyl to the criminal conspiracy, not a leader.  The evidence

also shows that Mr. Knox was not the sole supplier to HDS.  The actual leader of HDS, Mr.

Howell, testified that he had other sources of supply.  Trial Tr., Dec. 1, 2022, at 144 (naming two

other individuals in addition to Mr. Knox); Trial Tr., Dec. 1, 2022, at 81 (former Special Agent

Goucher reports that Mr. Howell provided a third name of a supplier).   One of the reasons Mr.

Howell sought other suppliers was that Mr. Howell did not always want to pay the high prices

that Mr. Knox was charging.  As for control of the day-to-day activities of the organization, the

trial testimony demonstrated that Mr. Knox had no role in directing the conspirators.  In contrast,

Mr. Howell decided who was going to be selling drugs on any given day, as he used a rotating

roster of sellers that he, not Mr. Knox, controlled.

   Reviewing the factors to consider when determining whether a defendant is a leader, as

set forth by the Guidelines[2] and the Third Circuit,[3] also persuasively support that Mr. Knox does

not qualify for the leader enhancement.  Mr. Knox had no "decision making authority" within the

organization.  His decisions occurred outside the organization and concerned the fentanyl

---

[2]  USSG §3B1.1(a), comment. (n. 4).
[3] *See United States v. Rodriguez*, 40 F.4th 117 (3d Cir. 2022) and *United States v. Adair*, 38 F.4th 341 (3d Cir. Jun. 30, 2022)

supplies he controlled.  Mr. Knox's "participation in the commission of the offense" was limited to being a supplier and sometime seller of smaller quantities.  There is no evidence that he recruited accomplices or claimed a right to a larger share of the fruits of the crime.  He also had no control or authority over others; and therefore, he cannot be said to have exercised a "high-level directive power or influence" over the organization.  *Rodriguez*, 40 F.4th at 121.

Accordingly, Mr. Knox's objection to the four-level enhancement for his role in the offense is sustained.  The four-level enhancement pursuant to §3B1.1(a) will not be applied in calculating the applicable guideline range.

## V.        Two-Level Increase Applied in Combination with Role as a Leader

In paragraph 16, the Probation Officer assigned a two-level increase to the offense level pursuant to §2D1.1(b)(16)(D), because Mr. Knox engaged in witness intimidation *and* because the Probation Officer had also determined that Mr. Knox was a leader in the conspiracy.  PSIR, ¶ 16.  According to the Guidelines, if the defendant receives an adjustment under §3B1.1, and the offense also involved the defendant being engaged in certain specified conduct pursuant to §2D1.1(b)(16)(D) (in this case such conduct is alleged to be witness intimidation or obstruction of justice in connection with the prosecution of the offense), then the base offense level should be increased by two-levels.  §2D1.1(b)(16)(D) and §3B1.1(b).  The Court has sustained Mr. Knox's objection to the four-level increase, finding he was not a leader as defined by §3B1.1(b).  Therefore, since Mr. Knox did not receive the required adjustment under §3B1.1(b), the two-level increase pursuant to §2D1.1(b)(16)(D) cannot apply.  Accordingly, Mr. Knox's objection to the two-level increase is sustained, and it will not be applied in calculating the applicable guideline range.

VI.     **Enhancement for Obstruction of Justice**

At paragraph 19, Mr. Knox's offense level is increased two-levels pursuant to §3C1.1, which is titled, <u>Obstructing or Impeding the Administration of Justice</u>.  PSIR, ¶ 19.  Section 3C1.1 states:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

§3C1.1.  Relevant to the facts of this case, Application Note 4 provides "a non-exhaustive list of examples of the types of conduct to which this adjustment applies: (A) threatening, intimidating, or otherwise unlawfully influencing a . . . witness . . . , directly or indirectly, or attempting to do so."  USSG §3C1.1, comment. (n. 4).  The government alleges that Mr. Knox threatened and intimidated, and attempted to threaten and intimidate, five cooperating witnesses, and all such conduct was related to the prosecution of the instant offense of conviction.   Common sense directs that "the effect on the person threatened, not whether the defendant intended the threat to be taken seriously, determines whether the threat constitutes obstruction under §3C1.1." *United States v. Goldberg*, 937 F. Supp. 1121, 1132-33 (M.D.Pa. 1996).

### *Conduct Undertaken While Incarcerated*

In assigning the two-level enhancement, the Probation Officer relied on the information provided by the government showing that, after his conviction, Mr. Knox engaged in threatening and intimidating conduct while he was incarcerated, by encouraging others to retaliate against witnesses who had testified against him.  PSIR, ¶¶ 9-10.  Mr. Knox sent electronic messages from jail to associates outside of jail.  Said messages consisted of the names of the five cooperating witnesses, disparagement of their decision to cooperate, personal information about

each witness, accusations that the witnesses were lying, and encouragement to label each witness as a liar and a "rat."  Mr. Knox asked that the recipient of his messages publicize them online.

The government's evidence demonstrates that the threatening and intimidating messages were published on the internet.  The messages identified the five cooperating witnesses, labeling them in order as:

> RAT #1-cooperator's name listed
> RAT #2 -cooperator's name listed
> RAT #3-cooperator's name listed
> 4 chose to eat the cheese-cooperator's name listed, and
> RAT #5-cooperator's name listed.

Gov. Exs. 3 & 4.  Prior to the listing of the names of the individual "RATS", and accompanying information, the internet poster relayed Mr. Knox's message that stated:

> NOT 1 but ALL 5 RATS CHOOSE TO WRITE STATEMENTS and
> TAKE THE FEDERAL STAND.

Gov. Ex. 4.  The re-posting of Mr. Knox's messages also appeared on an Instagram video post in which Mr. Knox himself is seen from jail briefly talking.  At the top of the post are the words "Free Mayhem Mal [Mr. Knox's nickname]," and just below these words are an image of a circle with a line through it, an image of a rat, and an image of a coffin.  Gov. Ex. 5.  The government also introduced a recording of a jail telephone call in which Mr. Knox is heard saying, "don't let none of those motherfuckers' names breathe."  Gov. Ex. 6.

### *Conduct During the Trial*

The government also introduced evidence of witness intimidation that occurred during the trial.  Agent Gramc was asked several questions relating to the witness intimidation.

Q. Now, you were present during the course of the trial, is that correct, sir?
A. That is correct.

> Q. And in terms of when cooperating witnesses were testifying as opposed to lab report people or law enforcement officers, did you notice any difference in the individuals who were in the courtroom?
> A. There was an additional group of males roughly the same age as the people testifying that were not present for the other parts of the trial.
> Q. And did you notice sort of a change in the demeanor or the atmosphere in the courtroom during those proceedings?
> A. Yes, I did.
> Q. And could you articulate what your observations were?
> A. The witnesses that were testifying seemed to be more nervous . . . .

Tr., Aug. 3, 2023, at 8.

Defense counsel's cross-examination of Agent Gramc focused on the absence of evidence as to who the court observers were; the lack of evidence from which one could conclude that the observers were engaged in witness intimidation; the fact that any member of the public is free to observe court proceedings; and that Mr. Knox has a constitutional right to express his opinion of the witnesses and their testimony.  The following relevant exchange between defense counsel and Agent Gramc occurred:

> Q. And had Jamal Knox used less colorful language and said, for example, you know, these individuals came to court and they testified against me and I believe that they were lying, would you have interpreted that as a threat
> A.. It all depends on the context.
> Q. Well, the context is four individuals came into open court and testified in a public proceeding and Mr. Knox's opinion was that these witnesses were testifying untruthfully against him.
> A. If he was saying to post it on social media and don't let them breathe, yes, I would consider that a threat.

Tr. Aug 3, 2023, at 22.

> Q. And as far as these individuals that you testified to that came to court and, according to [Assistant United States Attorney] Mr. Conway, engaged in witness intimidation, there was no effort made by the FBI or law enforcement to identify any of these individuals, is that correct?
> A. We've taken every threat that we've received and tried to identify anyone associated with it, yes.
> Q. Okay.
> A. But I have not identified any of the individuals, no.
> Q. All right. So we have no idea who these people were?

A. No.

Q. And we have no idea why they came to court, correct?

A. Correct.

Q. And this was in a public and open proceeding?

A. Correct.

Q. Anybody is free to come to court and watch trial testimony, correct?

A. That is correct.

Q. And that could be someone affiliated with the defendant, affiliated with a witness or just random people off the street who are interested in watching a federal trial, correct?

A. Anybody could come in, yes.

Tr. Aug 3, 2023, at 23-24.  Defense counsel also pointed out that there was no evidence that Mr. Knox directed anyone to place the images of a rat and coffin, etc. on the messages that ultimately published online.

### *Discussion*

Mr. Knox has a constitutional right to freely state his opinion on the veracity of the witnesses that took the stand against him.  However, Mr. Knox did not just express his First Amendment opinion about the character of the cooperating witnesses and their truthfulness.  He conducted a concerted effort to publicize the names of the witnesses while labeling them as "rats."  He also included his opinion of each witness and their testimony, along with brief biographical facts about each witness.  Mr. Knox directed this effort to make sure that others knew the names of the witnesses who cooperated against him and that each of them was a "RAT."  The messages were then posted online for the general public to see.  Rather than view Mr. Knox's opinion in isolation, the entire circumstances are considered when determining the nature of the communication.[4]  At a minimum, Mr. Knox's conduct in composing the messages, sharing them with an associate, ordering them to be published online, with the direction to not let such witnesses breathe, constitutes indirectly threatening witnesses and attempting to threaten

---

[4] The entire circumstances include the events that occurred during the trial in the courtroom when the cooperating witnesses testified.

witnesses.

With respect to the group of courtroom observers, who appeared only during the testimony of the cooperating witnesses, it is a given that any citizen may attend any public court proceeding.  However, when each of the cooperating witnesses took the stand to testify against Mr. Knox, it was evident that the specific group of courtroom observers were not in attendance merely to observe just these particular witnesses' testimony.

The Court has presided over the resolution of each of the thirteen defendants indicted in this case.  The Court has also presided over the resolution of many other defendants who were indicted in related cases.   The Court presided over numerous bond, evidentiary, suppression, and discovery hearings, and resolved numerous pretrial motions during the pendency of this case. The Court presided over the jury trial of Mr. Knox's co-defendant Duane Cash, at which some of the same cooperating witnesses testified.  The Court was present for the entirety of Mr. Knox's trial.  The Court is very familiar with how the conspiracy in this case was conducted over the years.  The Court thus has detailed knowledge of each defendant's circumstances and their criminal conduct.

During Mr. Knox's trial, the Court observed the choreographed entrance of the same group of men every time one of the cooperating witnesses took the stand.  The Court observed this group of men, who were not present for any other witnesses' testimony, enter the courtroom and take seats in the gallery behind Mr. Knox.  Obvious and visual personal acknowledgements between Mr. Knox and the group of men entering the courtroom occurred.  The events are memorable, as the Court also observed a palpable change in the courtroom when said men entered the room.  Considering the totality of circumstances, the Court finds that the group of men, who entered the courtroom only during the cooperators' testimony, did so with the intent to

threaten and intimidate the cooperating witnesses and/or their families, either directly or indirectly, at the behest of Mr. Knox.

The Court finds that, pursuant to §3C1.1, Mr. Knox willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the prosecution or sentencing of the instant offense of conviction, and the obstructive conduct related to Mr. Knox's offense of conviction. §3C1.1. Specifically, the entirety of the evidence demonstrates that Mr. Knox engaged in threatening and intimidating witnesses and attempting to threaten and intimidate witnesses sufficient to justify the imposition of the two-level enhancement.

Furthermore, the intimidators were successful in causing the witnesses to be in actual physical fear for themselves and their families. Such fear has been conveyed to the Court through the cooperating witnesses' attorneys and the witnesses themselves during various court proceedings. The witnesses' fear for their safety and their families' safety has been understandable and justified. The totality of information available to the Court has sufficient indicia of reliability to support its accuracy. *United States v. Watts*, 519 U.S. 148, 154 (1997).

Mr. Knox's objection is overruled. Accordingly, the two-level enhancement of §3C1.1 will be applied.

## VII.    Guidelines Calculation

Based on the above, the Court makes the following guidelines calculations in accordance with the United States Sentencing Guidelines.

The defendant's base offense level is twenty-eight (28). USSG §2D1.1(a)(5) & (c)(6).

The base offense level is increased by two (2) levels because the defendant possessed a dangerous weapon. USSG §2D1.1(d)(1).

The base offense level is increased by two (2) levels because the defendant maintained a

drug premises.  USSG §2D1.1(b)(12).

The base offense level is increased by two (2) levels because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the prosecution or sentencing of the instant offense of conviction, and the obstructive conduct related to Mr. Knox's offense of conviction.  USSG §3C1.1.

The total offense level is therefore thirty-four (34).

Defendant has eleven (11) criminal history points, which results in a Criminal History Category of Five (V).  Based on a total offense level of 34 and a criminal history of V, the advisory guidelines range call for imprisonment of 235 to 293 months.

Defendant is also subject to a minimum term of supervised release of four (4) years.

The defendant is ineligible for probation.

Restitution is not applicable.

The Guideline fine range for this offense is $35,000 to $350,000.  A special assessment of $100 per count is mandatory, for a total special assessment of $100.

Pursuant to 18 U.S.C. § 924(d)(1), forfeiture is applicable.  The property to be forfeited is 23 rounds of 9 mm ammunition.

**VIII.   Conclusion**

Sentencing is scheduled for January 17, 2024, at 9:00 AM.  Supplemental Information or Memorandum with Respect to Sentencing are due by January 10, 2024.

SO ORDERED, this 12th day of December 2023.

Marilyn J. Horan
United States District Court Judge